[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO STRIKE OF DEFENDANTS ABCO REFRIGERATION AND WORTHINGTON CYLINDER CORP.
The above captioned case arises from a fire at a supermarket under construction in Norwalk, Connecticut. In addition to negligence claims against other defendants, the plaintiff, Stop Shop Supermarket Co. CT Page 9925 ("Stop Shop"), asserts product liability claims against ABCO Refrigeration Supply Corporation ("ABCO") and Worthington Cylinder Corporation ("Worthington"). These defendants have moved to strike the claims of the plaintiff, which alleges that they are liable under the Connecticut Product Liability Act ("Product Liability Act"), Conn. Gen. Stats. §§ 52-572m et seq., for damage to its property and interruption of its business. The plaintiff makes these claims against Worthington in the fifth and sixth counts and against ABCO in the seventh and eighth counts of its Second Revised Complaint.
The movants allege that they and Stop Shop are all "commercial parties" and that the Act excludes liability among such parties for both property damage and such commercial losses as interruption of business operations.
Allegations
Stop Shop alleges in its second revised complaint that while a supermarket in its chain was under construction in Norwalk, an employee of a subcontractor, defendant F.D.R., Inc., used an acetylene torch fueled by gas from a cylinder in installing copper tubing in what was to be the meat preparation room of the building. Stop Shop alleges that defendant Worthington manufactured the cylinders that F.D.R., Inc was using on the site and that ABCO distributed them. The plaintiff alleges that the fire was caused by ignition of gas that escaped from an acetylene gas cylinder manufactured "without a cap, collar, or similar safety device protecting the stem and valve assembly from damage." Second Revised Complaint, Counts Five and Seven, para. 30. Stop Shop alleges that acetylene cylinders are "tall, thin, unstable bottle[s]" containing "a volatile, explosive gas," and that they have "a delicate stem and valve assembly" that was unreasonably dangerous without a safety device to protect this assembly from damage. Second Revised Complaint, Count Five, para. 31, 32.
Stop Shop alleges that the lack of these protective features allowed the cylinder to become damaged and cause an explosive fire from the escape of gas. The plaintiff alleges that such cylinders are inherently dangerous products and that ABCO and Worthington, as the alleged distributor and manufacturer, respectively, are "product sellers" as defined in the Product Liability Act and are strictly liable for damages caused by the allegedly defective product. Stop Shop does not allege that it purchased the acetylene torch or cylinder.
The plaintiff claims no damages to persons. It identifies its damages as follows: "25. The resulting fire caused property damage to the Superstore." Second Revised Complaint, Count One, para. 25, incorporated CT Page 9926 by reference into Counts Five and Seven."
Stop Shop also alleges that:
 25. As a result of the fire and associated property damage to the Superstore, the plaintiff suffered an interruption of plaintiffs business, including an extended delay in the planned opening of the Superstore.
Second Revised Complaint, Count Eight, para. 25.
Both movants assert that the Connecticut Product Liability Act does not provide a cause of action for property loss and losses caused by the interruption of business as between commercial parties.
This issue has never been decided by either of Connecticut's appellate courts. Because of this fact and because the size of the plaintiffs claim makes final determination by an appellate court likely, at oral argument, the court inquired whether the parties wished to refer this legal issue concerning the scope of the Connecticut Product Liability Act to the Supreme Court upon a certification. On July 8, 2002, counsel advised this court that they did not wish to pursue that suggestion.
Standard of Review on Motion to Strike
The function of a motion to strike is to test the legal sufficiency of the allegations of a complaint to state a claim upon which relief can be granted. Vacco v. Microsoft Corp., 260 Conn. 59, 65 (2002); Sherwood v.Danbury Hospital, 252 Conn. 193, 213 (2000); Novametrix Medical Systems,Inc. v. BOC Group, Inc., 224 Conn. 210, 214-215 (1992); Ferryman v.Groton, 212 Conn. 138, 142 (1989); Practice Book § 10-39. The role of the trial court is to examine the complaint, construed in favor of the pleader, to determine whether the pleader has stated a legally sufficient cause of action. ATC Partnership v. Windham, 251 Conn. 597, 603, cert. denied, 530 U.S. 1214 (1999); Dodd v. Middlesex Mutual Assurance Co.,242 Conn. 375, 378 (1997); Napoletano v. CIGNA Healtheare ofConnecticut, Inc., 238 Conn. 216, 232-33, cert. denied, 520 U.S. 1103
(1990).
In adjudicating a motion to strike, the court must construe the facts alleged in the complaint in the manner most favorable to the plaintiff.Vacco v. Microsoft Corp., supra, 260 Conn. 65; Gazo v. Stamford,255 Conn. 245, 260 (2001); Bohan v. Last, 236 Conn. 670, 675 (1996);Sassone v. Lepore, 226 Conn. 773, 780 (1993); Novametrix MedicalSystems, Inc. v. BOC Group, Inc., supra, 224 Conn. 215; Gordon v.CT Page 9927Bridgeport Housing Authority, 208 Conn. 161, 170 (1988). The requirement of favorable construction does not extend, however, to legal opinions or conclusions stated in the complaint, but only to factual allegations and the facts "necessarily implied and fairly provable under the allegations." Forbes v. Ballaro, 31 Conn. App. 235, 239 (1993). Conclusory statements or statements of legal effect not supported by allegations of fact will not enable a complaint to withstand a motion to strike. Mingachos v. CBS, Inc., 196 Conn. 91, 108 (1985); Fortini v. NewEngland Log Homes, Inc., 4 Conn. App. 132, 134-35, cert. dismissed,197 Conn. 801 (1985).
Connecticut Product Liability Act
The Connecticut Product Liability Act, at Conn. Gen. Stat. §52-572n (a), provides that "[a] product liability claim as provided in sections 52-240a, 52-240b, 52-572m to 52-572q, inclusive, and 52-577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."
The Act defines a "product liability claim" as one that:
 includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. "Product liability claim" shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence, breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or non-disclosure, whether negligent or innocent.
Conn. Gen. Stat. § 52-572m (b).
At § 52-572m (d), the Act provides that:
 "Harm" includes damage to property, including the product itself, and personal injuries including wrongful death. As between commercial parties, "harm" does not include commercial loss.
The Act contains further reference to "commercial claimants" and CT Page 9928 "commercial loss" at § 52-572n (c):
 As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim. An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code.
The Act does not include a definition of "commercial parties" or "commercial loss."
Statutory Construction
The issue raised by the motions to strike is whether Stop Shop is a commercial party that cannot recover for property damage and consequential losses to its business pursuant to the limitations on the coverage of the Product Liability Act set forth above.
The Connecticut Supreme Court has adopted an approach to statutory construction based not solely on the words of a statute nor solely on its legislative history, but on a consideration of a variety of indicators of the statute's scope and purpose. "[O]ur fundamental objective is to ascertain and give effect to the intent of the legislature." Gartrell v.Dept. of Correction, 259 Conn. 29, 39 (2002); Petco Insulation Co. v.Crystal, 231 Conn. 315, 321 (1994); Laurer v. Zoning Commission,220 Conn. 455, 459-60 (1991). "In determining the intent of a statute, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter."Gartrell v. Dept. of Correction, supra, 259 Conn. 39; Polizos v.Nationwide Mutual Ins. Co., 255 Conn. 601, 607 (2001); Williams v.Commission on Human Rights Opportunities, 257 Conn. 258, 270 (2001). "Statutes should be construed, where possible, so as to create a rational, coherent and consistent body of law." Waterbury v. Washington,260 Conn. 506, 557, rehearing requested (2002); Doe v. Doe; 244 Conn. 403,428 (1998), overrued in part on other grounds, In re Joshua S.,260 Conn. 182 (2002); In re: Valerie D., 223 Conn. 492, 524 (1992). If two interpretations are plausible, the Courts should favor the construction that is more consistent with the underlying purposes and intent of the legislation. Gartrell v. Dept. of Correction, supra,259 Conn. 39.
A court determining the meaning of a statute should "begin with the language of [the statute]," Doe v. Doe, supra, 244 Conn. 424, and CT Page 9929 consider the use of the same terms in other, closely related statutes in the same area of law, Doe v. Doe, supra, 244 Conn. 426-27, while endeavoring not to give different meanings to the same terms in closely-related statutes. Additionally, a court should look to the legislative history of the statute, both for the use of terms in revisions over time and for statements in legislative debate that reveal what the legislature thought the wording of the statute meant, Doe v.Doe, supra, 244 Conn. 434, and court decisions which defined terms in ways that the legislature may be presumed to have considered as well as "interpretive jurisprudence" concerning the same term in related contexts. Williams v. Commission on Human Rights Opportunities, supra,257 Conn. 271; Doe v. Doe, supra, 244 Conn. 435-439.
Where the purpose of a statute is to compensate parties that suffer losses, the courts should "eschew a narrow and technical reading . . . in favor of one that promotes compensability." Gartrell v. Dept. ofCorrections, supra, 259 Conn. 40.
Is the plaintiff a "commercial party?"
The provisions of the Connecticut Product Liability Act cited above preclude recovery by "commercial parties" or "commercial claimants" for "commercial loss." The Act does not define these terms.
Analysis of the Product Liability Act's various provisions on the subject of recovery for commercial loss, however, provides guidance. The statute provides at § 52-572n (c), cited above, that a commercial claimant's remedy for commercial losses is provided by the Uniform Commercial Code ("UCC"), Conn. Gen. Stats. §§ 42a-1-101 et seq. This provision suggests that what is meant by "commercial parties" is parties that stand in relationships toward one another that are governed by the provisions of the UCC, that is, those who buy and sell goods from each other and for whom the UCC therefore furnishes a remedy. Article Two of Uniform Commercial Code sets forth legal principles concerning transactions in goods. Conn. Gen. Stat. § 42a-2-102 defines the scope of that Article: "Unless the context otherwise requires, this article applies to transactions in goods. . ." The UCC provides remedies to one who purchases defective goods, including incidental and consequential damages caused by a seller's breach. Such remedies are defined in §42a-2-715. That statute provides for recovery for consequential damages including "(2) . . . (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty." The UCC does not employ the term "commercial loss." The Product Liability Act's reference to resort to the CT Page 9930 UCC provisions by commercial parties strongly suggests that "commercial parties" are parties who have a remedy under the UCC, and that they are limited to their UCC remedies and may not also assert a claim under the Product Liability Act. See Hartt v. Schwartz, Superior Court, judicial district of New Haven, Docket No. 331912 (December 3, 1997).
The limitations on the remedies available to "commercial parties" were added to the Product Liability Act in Public Act 84-509. The legislative history of that amendment does not include any definition of "commercial party." The bill that was enacted as Public Act 84-509 originally contained two provisions: 1) to allow commercial parties to agree by contract to the proportion of liability that the manufacturer, distributor, retailer, and others in a chain of sales transactions would have for damages caused by a product, and 2) to exclude recovery under the Act for losses governed by commercial law applicable to commercial entities. Only the second provision was enacted.
At the Judiciary Committee hearing on the bill, Gregory Sweeney, a lawyer for United Technologies, urging a favorable consideration, stated that "(t)he Bill under consideration is designed to clarify the application of the Connecticut Product Liability statute to commercial entities in their dealings with one another." Conn. Judiciary Committee Hearings, March 19, 1984, p. 0747. Attorney Sweeney explained his understanding that the purpose of the two features of the proposed amendment was to "place squarely under commercial law, risks of commercial loss, as well as other risks of product caused harm that the commercial entities may elect to apportion contractually." Id. p. 0748. He stated that these features were consistent with the practices of parties that sold goods to other businesses:
 Where commercial entities contract with one another for the sale and purchase of products, each party generally has insurance or similar arrangements in place that are directly related to the risks to which that party is exposed under the terms of the sale-purchase contract and frequently the terms of agreement having to do with such apportionment of risk are among the most heavily negotiated between commercial parties.
Id. p. 0749. This proponent of the bill plainly suggested that the bill was being proposed on behalf of business entities to allow them to insure and limit their exposures in connection with purchase and sale of goods. A comment of a non-legislator at a hearing is not evidence of the intent of the legislature Savings Loan League of Connecticut, Inc. v. CHFA,184 Conn. 311, 315 n. 1 (1981), but it provides some background as to the CT Page 9931 context of the bill at the time it came to the legislature for consideration. The Connecticut Supreme Court has counseled that the courts must look to the circumstances" surrounding a legislative enactment. Doe v. Doe, supra, 244 Conn. 434-39. The statements of a representative of industry to the effect that the purpose of the amendment is to affect liability under the Act only for those who enter into purchase and sale agreements concerning goods that may cause losses is worthy of consideration as an indication of the circumstances of the amendment.
After the Judiciary Committee hearing at which the proposed amendment was thus described as relating to the liabilities between businesses that contracted for goods, not to users or consumers, the legislators referred to the parties to be affected as "commercial entities." In moving the passage of Public Act 84-509, Senator Owens explained that "This Bill would specify that a contract is enforceable even though it prevents recovery from loss or damage or from harm as long as the contract is between commercial parties and effects only those who are actually parties to the contract." 27 S. Proc., Pt. 4, 1984 Sess., p. 1372. Another legislator, Senator Smith, received an affirmative response from Senator Owens to his query, "Could you just confirm for me whether this just applies to commercial parties within the contract, Senator Owens?" Id. This explanation and the repeated reference to parties with contractual relationships concerning the product strongly suggest an intention to affect the remedies only of those who had contractual relations regarding the goods claimed to have produced a loss.
Representative Parker stated that "[t]he bill would apply only between commercial parties, not the general public." 27 H.R. Proc., Pt. 11, 1984 Sess., p. 4048. In the Senate debate, the bill included a provision that would have allowed enforcement of terms in contracts between commercial parties that prevented recovery for product defects as well as one that "would preclude a commercial party or organization from suing for commercial loss under the Product Liability Statute and would require that such commercial lawsuits be brought only [under] the uniform commercial code statute." 27 S. Proc., Pt. 9, 1984 Sess., p. 3230.
The portion of the bill that would have allowed allocation of liability by contract between those selling and buying the product was dropped from the proposed amendment, and only the first provision was enacted.
No one who spoke concerning the amendments now codified in the cited provisions of the Product Liability Act suggested that it would limit the recovery of injured parties who were not involved in purchasing or selling the product that was claimed to be defective. CT Page 9932
Another source of guidance in interpreting the statute is "interpretative jurisprudence." Doe v. Doe, supra, 244 Conn. 435. That jurisprudence includes an approach favoring a separation of the realms of activity governed by the UCC from those governed by other legal provisions. In Flagg Energy Development Corp. v. General Motors Corp.,244 Conn. 126, 154 (1998), the Court approved the granting of a motion to strike claims for economic loss under CUTPA and other provisions by plaintiffs who sued the vendor of gas turbine engines purchased for a construction project. Justice Peters, writing for the court, explained that as between parties who contracted for the purchase and sale of goods, the remedies were those available under the UCC. The Supreme Court referred to the amendments to the Product Liability Act cited above as illustrative of the limit on the scope of remedies available to those whose claims were also subject to the UCC. Flagg Energy DevelopmentCorp. v. General Motors Corp., supra, 244 Conn. 154.
Other jurisprudential evidence of the meaning of the amendment to the Product Liability Act concerning commercial losses to commercial parties is supplied in Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559,582-83 (1995). In that case, the Court noted that it had stated in Verdonv. Transamerica Ins. Co., 187 Conn. 363, 372-73 (1982), in dicta, that when the General Assembly enacted the Product Liability Act, it defined "harm" in a manner that included purely commercial loss. In Verdon the court concluded that recovery for commercial loss unrelated to damage to property was available to all claimants under the Product Liability Act. This interpretation represented a change from prior rulings on this issue.
Before the enactment of the Connecticut Product Liability Act, a plaintiff could recover on a theory of strict liability in tort and recover both property damages and such consequential losses as loss of rent while the damaged property was being repaired. Coe-Park Donuts,Inc. v. Robert Shaw Controls Co., 1 Conn. App. 84, 85 (1983). Connecticut's courts applied Section 402A of the Restatement of Torts to such claims. Rossignol v. Danbury School of Aeronautics, Inc.,154 Conn. 549, 559-60 (1967); Garthwait v. Burgio, 153 Conn. 284, 289
(1965).
In Rossignol, the Supreme Court recognized that under § 402A, physical harm to the plaintiff or the plaintiffs property was an essential element, and economic loss without physical harm was not compensable.
In Williams Ford, supra, 232 Conn. 559, the Court explained that the legislature had responded to the new interpretation in Verdon with the amendment of Public Act 84-509, excluding purely commercial loss to commercial parties (that is, loss not related to loss to property) from CT Page 9933 the definition of "harm." Id. The Court plainly regarded this legislative response as a rejection of the view that purely commercial loss was a variant of harm to property for which the Product Liability Act furnished a remedy to all claimants. In P.A. 84-509, however, the General Assembly did not preclude recovery for commercial loss for all claimants under the Act, but only for "commercial parties."
This approach leaves parties whose relationship are subject to the UCC to the remedies supplied by the UCC, and it permits other claimants the remedies provided by the Product Liability Act.
The purpose of the Connecticut Product Liability Act, as revealed in Conn. Gen. Stat. § 52-572m (b), is to simplify pleading and create uniform rules for the various causes of action it encompasses, not to alter the substance of the various rights of plaintiffs under the various causes of action it replaced, such as those based on strict liability in tort, negligence, etc. LaMontagne v. E.I. DuPont DeNemours Co.,41 F.3d 846, 855 (2nd Cir. 1994).
Stop Shop has pleaded that its uncompleted building was damaged by the claimant product defect, and it thus seeks the same kind of damages as the plaintiff in Rossignol, not "purely economic loss," that is, losses not resulting from property damage.
The complaint contains no suggestion that Stop Shop purchased the acetylene cylinder at issue or that it engaged in any transaction with the movants that would be governed by the UCC.
The movants suggest that the court should consider Stop Shop a "commercial party" on the very general reasoning that it is engaged in commerce, applying a dictionary definition to the word "commercial." The Act's reference to UCC remedies, the legislative history, and the jurisprudential history suggest instead that what the legislature meant by "commercial parties" was those parties whose relationships with the defendants were governed by the UCC. This court notes that the Supreme Court has not approved use of dictionary definitions to trump other indicators of the legislature's intent. See Gartrell v. Dept. ofCorrections, supra; Doe v. Doe, supra.
Because the complaint contains no allegation that suggests that the plaintiff stands in a relationship to the movants that would make UCC remedies applicable, and because the loss claimed is one resulting from property damage, this court concludes that the plaintiff is not a "commercial party" in the context of the Product Liability Act, as amended, and that it is not precluded from seeking remedies under that Act for damage to its property and for interruption or delay of its CT Page 9934 business activities on the site.
Conclusion
For the foregoing reasons, the motions of Worthington to strike the fifth and sixth counts and of ABCO to strike the seventh and eighth counts of the plaintiffs complaint are denied.
 Beverly J. Hodgsson Judge of the Superior Court